Judges of the United States Court of Appeals for the Second Circuit, oye, oye, oye, all persons having business before this, a stated term of the United States Court of Appeals for the Second Circuit, draw near, give your attention, and ye shall be heard. God save the United States of America in this honorable court. Before we call the first counsel up, let me just say a word or two about the state of play. Today we're hearing argument that U.S. versus Donald fell for the second time. Can you hear me? I can, but I don't know what to do. I'm happy to disappear. Okay, so what can I do? This is the speaker. Here is the speaker. Thank you. How is it now? Okay. Today we hear argument that U.S. versus Donald fell for the second time this term. On November 7, 2017, this panel held oral argument on the question of whether the admission of the inculpatory statements of Fell's deceased co-conspirator, Lee, at Fell's sentencing hearing, violated the Confrontation Clause of the Sixth Amendment. The panel noted at that oral argument, however, that it need not reach the Confrontation Clause question if the statements the government sought to introduce were not sufficiently reliable to meet the evidentiary standard required for admission of evidence at sentencing under the Federal Death Penalty Act and the Due Process Clause of the Constitution. The district court had not answered that question before ruling that admission of the statements would violate the Confrontation Clause. We therefore remanded the case without ruling on the Confrontation Clause issue, and we directed the district court to determine whether the deceased co-defendant, Robert Lee's, post-arrest statements and prison writings are sufficiently reliable under the Due Process Clause and the Federal Death Penalty Act. On remand, in an order dated January 19, 2018, the district court decided that some of Lee's statements were reliable under both the Due Process Clause and the FDPA. After a motion for reconsideration was denied, defendant appealed that reliability determination. We granted defendant's request for additional oral argument. The ball is thus now back in our court, and the issue before us today is whether the district court properly found some of Lee's We'll hear first from Mr. Darrow. Thank you, Governor. Good morning. I'm Bill Darrow from the U.S. Attorney's Office in Vermont. In the wake of your remand order, Judge Crawford, the district court, scheduled what we've been calling a reliability hearing, which took place over four days in early January of this year. Prior to the hearing, Judge Crawford asked the parties to each submit a memorandum as to the respective parties' view of the political law, and so the court had that podium for the reliability hearing. At the hearing, both parties called witnesses. I'll try and summarize the positions briefly. The defense called a number of witnesses who were familiar with deceased Co-Defendant Lee during his youth in Wiltshire, Pennsylvania, and they testified generally that he was not trustworthy and lied. The defense also called a mental health expert who testified. Also that he had a tendency to shift blame away from himself and put it on other people. Yes, that's fair. The mental health expert, Dr. Shields, then followed up and testified that he had reviewed a fairly robust mental health history for Lee, that Lee had been repeatedly diagnosed with what's called a conduct disorder, and that among the diagnostic criteria of conduct disorder is lying, and although it's not one of the diagnostic criteria in the DSM literature, associates as another symptom of conduct disorder blame shifting. So the theory was with these witnesses that Bobby Lee's an incorrigible liar and can't be trusted. The defense also attacked, through a couple of witnesses and cross-examination, the officers and agents who conducted the post-arrest interviews of Lee out in Arkansas after the November 2000 arrest for the proposition that the interrogation had been manipulative or coercive. For its part, the government put on a couple now-retired law enforcement officers who had helped conduct the interviews of Lee out in Arkansas. One, a retired FBI agent, Agent Cottle, and the second, one of the Vermont officials, Lieutenant Cruz, who flew out from his Vermont State Police barracks near Rutland with a Rutland police officer to interview Felton. They conducted, those Vermont officials, conducted a separate recorded interview of Felton after Agent Cottle's non-recorded interview of Felton. Lee or Felton? Lee, I apologize. Well, both, but I meant to say Lee, yes. In addition, the government called a retired Pennsylvania State Police trooper who had had some involvement with Felton and Lee back earlier in September of 2000 before they both went to Vermont, and that witness was of interest because although Felton did not provide a motive for the two Rutland homicides, Lee said that he and Felton, and I'm not quoting, but in effect, we had been laying low in Vermont because warrants were out for us in Pennsylvania, and this trooper, the third government witness, described his investigation. He'd been the investigator assigned to a series of car break-ins on September 9th, and he was targeting Lee and Felton and had contacted Lee to make arrangements to meet with him and interview him, and Lee left for Vermont the next day, and Lee described getting a call to set up an interview with Lee the next day to avoid him. So the government's theory was that Lee's statements were well-corroborated. We submitted with what we're calling a reliability memoranda filed before the hearing on the law. The government submitted the transcripts and the audio recording of the Lee statements and the Felton statements and the written statements. So over four days, Judge Crawford had not heard this evidence. He issued the order you refer to, the motion to reconsider, and he applied reconsideration. Turning to the vitality of Judge Crawford's decision, I think of it in the two parts. He made a legal determination as to what the standard, the due process standard, was that applies to sentencing, and then he applied that standard. As to the decision he made as to the legal standard, Judge Crawford adopted a standard that had been established in this court back as far as 1973 in the United States v. Needles decision, which is cited in the papers and also cited in the Fatico decision, which followed up in 1978, which reached a similar result, and that rule permitted hearsay at sentencing in a noncapital case if it was corroborated or reliable. Fatico applied the same rule, and in both of those cases, the government put an agent, an investigating agent provided information to the court, which included hearsay, and the courts determined that that information was sufficiently corroborated or reliable to be admissible at sentencing. In Fatico, the court pointed out that although false information may not be considered as sentencing under the due process clause, and if there's a significant possibility of misinformation, then the sentencing court should require the court to provide some verification or attempt to support the information. Nevertheless, the hearsay statements are sufficiently, when they're sufficiently corroborated by other evidence, hearsay is admissible in sentencing proceedings. So that rule has been well established for 45 years, since the early 70s. That standard has evolved a bit and was described in the Martinez case, cited by the district court and the government in 2005, as requiring that some indicia of reliability, that's the language in the Martinez case, must accompany hearsay in order for it to be considered at sentencing. And that phrase finds itself in a lot of decisions from sister circuits. It's very close to the phrase also that's in the United States Sentencing Guidelines in Section 6A1.3A, where the guidelines say that hearsay is okay if there is sufficient indicia of reliability. And then the Fourth Circuit, the Ninth Circuit, heavy decision also cited, I think, by Judge Crocker. Can we talk about this particular case? I think we're generally familiar with the standard. What I found lacking in the judge's decision was any mention of the presumption of unreliability that attaches to an accomplice's testimony. And that presumption is well-developed in the Supreme Court in Bruton and Lee and Lilly. And those may not be directly factual here because they were trials, but still it seems, and in some cases we were talking there about the Sixth Amendment, but whether testimony of an accomplice or a witness is reliable, it seems to me, is the same question regardless of which provision of the Constitution you're dealing with. We're looking at basic reliability of an accomplice. And here you have an accomplice, and those cases fully discuss what common sense would indicate, which is that when people are interviewed on arrest after committing a crime, they tend to minimize their own involvement and maximize the involvement of the other person. It's almost human nature whether you're doing it with intent or not. And that seems to me pretty integral to this case. And there was no mention of a presumption of unreliability here by the district judge. And that seemed to be a problem to me. Thank you. Judge Walker, the defense pressed hard on those complications of the Sixth Amendment cases when we were last before you in November. Right. And did so again with Judge Crawford. And Judge Crawford, I think it was in a footnote, and I don't know if he actually cited the Lee decision or not, but it determined that confrontation clause rules, which apply during the guilt phase, the termination of guilt, that those same rules don't restrict hearsay in sentencing. And what was his basis for saying that? Just because the precise issue hadn't arisen before? It seems to me that when you're talking here about the imposition of the death penalty and you're relying on an accomplice's statement that's not cross-examined and the accomplice is not available, you know, he said, that if there's a propensity on the part of co-defendants to point fingers at each other, then that would be highly relevant. Right. I think probably what the district court had in mind, although I'm not sure he said so in that footnote, was that all of these cases treating the due process clause in hearsay in sentencing from the Second Circuit and from other circuits have declined to import that confrontation clause rule that applies at guilt phases. Yeah, I'm not suggesting that. I'm just looking at it as a matter of common sense. And it seems to me that one could, whether or not it's directly important in the cases or would be an extension, it just seems to be a matter of common sense that you're dealing with here. It does have a feeling, and you can note in this case, I understand that. But the fact that they lied 100% at the beginning, which you conceivably did, doesn't necessarily mean that he's 100% truthful after that. He could be 50% truthful. And so that gets to my next question, which is the kind of corroboration that the judge relied on. The judge relied on Fell's statements as corroborating Lee, and also the timeline that was obvious to everybody, including the investigators, as corroborating his statement. But the differences between what Fell said and what Lee said, which are rather critical, because that's why I think this testimony is being sought and admitted, those particular differences, I might look at it as embellishments. I think the government has said, we're trying to fill in the gaps here with Lee's statement. Those particular embellishments, I don't see them as corroborated virtually at all. There are two respects, as I understand it, that this is being offered. These are for non-statutory aggravated facts. And the two are the heinous, cruel, depraved killing of another, which would apply to Charlie and Debbie, and I suppose to Teresa. And then the other would be the killing to obstruct justice. Now, focusing on the first one, the difference between Fell and Lee is pretty stark about what Lee says Fell did and what happened at that time. And I don't see any other, and there wouldn't be, probably, because everybody's either dead or you've just got Fell, any corroboration of those particular embellishments. And I am referring to the fact that Lee says that Fell told him to kill Debbie. But Fell says that Lee killed Debbie on his own after seeing that Fell killed Charlie. And Lee claims that Fell tried to grab the muscles out of Charlie's slashed neck and tried to pull them out. And Fell says nothing of the sort. There's no corroboration of that. And Lee claimed that while he was stabbing Debbie, Fell egged him on, telling him to cut her throat, cut her throat. And Fell says the opposite. He says he didn't want him to kill Debbie, but once he started doing it, he saw it was too late. So these are stark differences for which there is really no corroboration. And how can anyone trust Fell's statements in this regard? And Lee's statements, I'm sorry, Lee's statements. Your Honor, you've covered a lot of ground, and I want to try and respond to your inquiry. Okay. First, before we got into the facts, I said that the many decisions that were made treating due process sentencing did not import the Confrontation Clause standard. And there is one exception to that, the Ninth Circuit case of Hyman Paul Lopez, which the defense has consistently cited. And that case did say, it mentioned the minimal initiable liability test, and then it says, but, you know, there's also this presumption when a court defendant is sentenced. Right. So there's one exception to that rule. But generally the cases don't import that standard. Now, turning to the facts, it's our position, and I think it brings the view of Judge Crawford after he looked things over, that the vast bulk of Lee's statements are not heavily corroborated. They're corroborated both by fell statements. But not in the respect that you want to offer, as I understand it. I mean, you want to show that this crime was heinous and fits the non-statutory aggravated factors of a heinous crime. And the various aspects, the differences between fell and Lee that show heinousness are really Lee's statements, but not fell. And to a great degree, and there's no actual corroboration of that. Of course, I mean, the matters that I just mentioned. Well, I have a question. This is pretty obvious. I haven't thought of Lee's statements as being an important part of the case on that. Really? That was one of the reasons. Well, you wanted a statement that Lee claimed that after Donnie Fells stomped on Teresa, blood came out of Teresa's mouth, I'd say about a foot in the air. It looked like what I would call a geyser. There's no corroboration of that. And that's, you know, inflammatory to say the least. And there's no support for that, other than that particular statement. I think there is some support for that. But also, we didn't have difficulty proving a heinous aggravator in 2005 without Lee's statements. Just because there's no evidence. So why are you going down this road? Why are you going down this road now? The reason why we're going down this road now is that this case is being litigated in a very different manner, than it was in 2005. And it is clear from the bits of insight that we have identified in the defense case that they are going to try and present Lee as the major player. An example of that would be medical care. At that point, the defense challenged both Dr. Botkin, who was the original medical care reformer, and Dr. Lee, as unscientific. But you've got Fell's confession, which was the horse you rode in the first trial. Right. The defense medical examiner testified, and it was reported, that narrowed the extent to which our medical examiner can address this, that the fatal injuries were caused by Lee, not by Fell. Fell said, you know, I use my feet, and there are kicks, bruises on my feet and head. There was also an impression in his neck, where he felt a thump on his throat. But the jury was going to hear that the fatal injury was killed, because it was a blow to his head, which was Lee's work. And so, you know, we're at the 20s of Lee. But that doesn't change the whole calculus on reliability, the fact that they've altered their theory a little bit. We still are looking at the reliability point. And you've got non-corroborated, hearsay testimony of a deceased co-conspirator, whose past indicates a penchant on shifting blame to others. It just seems to me that you've got a high hurdle to show that these are reliable statements. Hopefully, we'll be able to get back to you about Lee's case. Now, of course, some fellow describing a homicide, and four days of interstate flight, is not going to have exactly the same specifics in every regard, in every regard as another man describing the same circumstances. But all the main things, to our mind, are relative. The overlap, the extent to which they're similar, is marvelous. Right down to, well, for example, Lee said that he left Debra Bell's body with her feet towards the television and her head up by the pillow. That was her crime scene photograph. So her body was lying there. He said when she was struggling in the room, she knocked over a table. Well, there's a coffee table in the room. The other armchair, she was knocked over. I mean, all the men say that they, after the killing, took a shower, attacked, left their luggage in the kitchen, grabbed the shotgun and left it with their car. Well, that's exactly what they did. Some of the luggage they left behind, and it's packed on the kitchen table. Lee said, Lee's very specific in contrast with Bell. Lee did, for example, Bell said, Lee said, quote, the blue duffel bag, the army duffel bag, the this, that, the knives. Bell also mentioned the knives. But Lee gives an inventory of the people. But Lee also said, we couldn't catch the cat. We wanted to let the cat out, but we couldn't find it. So we left it there. Responding crime scene fellows, when they show up, there's a cat in the apartment. And it goes on that way. Through the seizing, Mrs. King, the price chopper. Lee said they tried to buy ammunition from the Walmart, but the stock didn't have any before they grabbed Mrs. King. An employee from a local Walmart working at Michael's calls these two guys coming in with wet hair that wanted to buy ammunition. They tell him, we're closed. Let me ask you this. It appeared that the hypothetical, if this testimony, this Lee testimony, were objectively unreliable, there's no question that it should be excluded from the selection phase, correct? Yes. Okay. And that's regardless of whether, we don't care really whether any other court of appeals has applied on this, but there's no Supreme Court jurisprudence out there that bars this type of inquiry in a selection phase in this type of trial. Is that right? If I understand you, Judge, yes. And in fact, the Williams v. New York Supreme Court in 1947 specifically held that Pearson was invisible at the sentencing table. All right. But so putting Williams aside, there's no, I mean, I've looked at these cases. I don't think the Supreme Court has really addressed this case. Williams is due process, and Williams is pre-incorporation, and so there's been a lot of water under the bridge. But the touchstone of this inquiry is reliability, objectively reliability, objective reliability. Would you agree? I do, Your Honor, although I'm not sure what you mean by objective reliability. That can be divine from the record. Okay. Yeah, I would agree with that. Yeah, and then if it's unreliable in that regard, it shouldn't come in. I think you're right. The only hesitation I have with this, some minimal additional reliability standard is a non-capital standard. We think that it can be applied to the selection phase of a capital case. However, if you recall, as you pointed out in the 2004 appeal, in the first interlocutory appeal, there is a plethora of Supreme Court cases treating the death penalty, saying the jury needs, during the selection phase, they need extensive information about this fellow. But they never need unreliable information. Isn't that correct? They never need unreliable information. No. No. Let me go back to a matter raised by Judge Parker. These statements were not admitted at the first trial in which fellow was sentenced to death. Is that right? Right. So none of the matters we're talking about today, none of the items of evidence, were before the jury or the judge at that first trial. Okay. That was, again, the law had changed after the session throughout the circuit, including the field decision from the Fifth Circuit, where they held that hearsay, the evidence was just to come in and be revisited as a matter. And as we've been dealing with these suggestions, Lee wasn't really the main guy here. I noticed that the question of who took the lead in these killings seems to be what's maybe at issue in this case, as opposed to the earlier ones, correct? But that's not one of the statutory, non-statutory aggravators of leadership that has been cited so far. It's, I guess, a subliminal kind of argument that they would be making, that really this was Lee's. Lee was doing all of this, not Fell. But if it's not, doesn't go directly to the aggravator, you haven't set it forth as necessary, a necessary aggravator or an aggravator that you're seeking to prove as far as Fell is concerned, and I'm not sure I understand why this is such an important point. We consider Lee's description of what happened to be more truthful and more confident than Fell. It's a more narrative detail, as I mentioned, every different type of luggage and any of that, but generally, he remembers things that happened during the drive. He remembers discarding the king's purse at the Burger King after Killian. He provides a lot of detail as to what happened, when it was happening, because he was present, and we think that that allows the jury to get a more accurate, more complete story of what happened. Are you concerned the juries might disbelieve Fell's confession? Well, Fell said a lot of things that weren't quite accurate. I think we're likely... Well, you have him delivering blows to the woman, right? Well, he said, I'd use my feet. That's what I meant. Yeah, no, I don't mean to deny that he denied delivering blows. I think it was a joint effort by both of these guys to kill her, and I anticipate, I hope to prevail in the guilt phase, notwithstanding the change in the medical standards. Let me ask you this. I have lived with this case, as have my colleagues, for a number of years. I'm not sure I see what the endgame is here. I mean, this incident, this gruesome murder, took place nearly 20 years ago, and there's been litigation and litigation, and in certain respects, we're almost back to square one. We're starting a merits trial soon. What's going on? What's happening? I'd like to share some of your concerns about it, because I was the AUSA who argued in front of you down at the Moynihan Courthouse in the summer of 2006 on private field. I can't remember. It's been so long. It has an incredible timeline, and I'm the only one left in the district court litigation. They're not going to let you go until the case is over. Well, that's right. You've been sentenced. But it's, I mean, are we going to be here 10 years from now? I mean, you may be here. Three of us probably won't. I don't think we'll be around next time around. Sorry? I don't mean to be facetious, but at the end of the day, this is not an exercise for counsel and for us. This is a proceeding that in a real sense belongs to the public, belongs to the polity, and I just don't see how the interests that are really at heart in this case, bringing someone to justice is served by a proceeding that's gone on for 20 years and from what we're hearing today appears to be set to go on for another 10 years. All I can tell you is we got the case to the jury as quickly as we could back in 2005. We defended the jury's verdict as vigorously as we could in the wake of that telephone appeal in the 2005 litigation, and since the case was assigned to Judge Crawford in, I think, January 2015, we've been pushing as hard as we can to get the case back to another jury. When do you expect to pick a jury? I'm sorry? When do you expect to pick a jury? Judge Crawford's scheduling order says that the jury draw will begin in, I forget the exact day, in September, but the first week of September. And all the motions, pre-trial motions, will be decided by then? And whatever appeals there may be will be decided by then? Assuming that we move with all due haste. Well, it would be, the due haste of this would be a decision on the interlocutory appeal by July 23rd, which is next week. But Judge Crawford's scheduling order said, you know, we're going to draw a jury to try this case in the fall as long as we get directions from the circuit. So you don't anticipate, after this, that there will be other appeals to us before the trial? No, I don't, Your Honor. And in fact, we gave hard consideration to appealing as an adverse to our role in the medical damage testimony, which came out in May. But we thought if we go back to the circuit on that, there's no way that we're going to get the trial in the fall, so we didn't do it. Are there, with respect to the unresolved motions in limine, are there any of those in respect of which an adverse ruling could trigger an appeal to this Court? Your Honor, the last thing we want is anything that's going to delay trial. And I can't imagine that we would take an interlocutory appeal. Of course, it's hard for me to imagine what would happen. But I think Judge Crawford has been working hard through the backlog of the motions that were in existence back in November. We have been having monthly hearings that are churning through a dozen of them at a time. Of course, 20 more were filed in the last couple weeks. So, I mean, he has more work to do, but I think it's our hope and expectation that he is determined to get this case in front of a jury again in September and we'll shoot through those. Did I hear you correctly? So there are 20 additional motions in limine? I'm sorry, you said motions in limine. They're not all motions in limine. They're pre-trial motions. For example, there's a motion challenging the way the District of Vermont selects a jury saying that it discriminates against minorities. That two-day hearing is scheduled Monday and Tuesday from Judge Crawford on that motion. That's probably the biggest one, but there are a lot of other motions that are needed. And we have a list of those motions just from the public record and I might, I would imagine that Judge Crawford can decide these orally from the bench in most cases without the need for an elaborate opinion for which we're grateful, by the way, for his careful work on this particular matter. But let me ask you a final question before we turn to opposing counsel. I've given you plenty of extra time. Assume for the argument that we hold that none of these items of evidence is admissible under the Due Process Clause or the statute. And we remand quickly to the District Court. If I understand your response to Judge Parker, that would trigger a schedule which is, has already been set in which everyone is confident, can be, can be kept and there will be a selection of a jury in September. Yes. I only have to say that I'm not on. I can't speak for... In other words, what I'm suggesting is the possibility that the whole question of the Confrontation Clause, that that question doesn't have to be addressed at this time. If, in fact, the defense prevails across the board under the Due Process Clause. It doesn't have to turn to the Confrontation Clause. Which would be another substantial proceeding. I'm not sure I'm following you. The District Court held that under the Confrontation Clause these statements can't come in. So, I think unless... So, there's nothing left on that. So, if we decide this on the basis, on the basis of the Due Process Clause and you do not prevail on these matters, you're ready to go to trial. And that would be in September. There would be these other motions that are pending, which could be resolved in the usual expeditious manner of a district judge. Right. All right. The District Court's idea was that in July, we paid for your orders. We need about a month to go through the process of calling up the district court to take that penalty on their request. Sure. How long did the last trial take? The last trial went faster than anyone thought, Your Honor. There were, I think, a total of 14 or 15 days of orientary spread out over... I just need a... I don't need a date by day. I just need a global number. Let's say a calendar, a month for drawing a jury. But for the time the jury was sworn in, the actual trial itself. Okay. From the time the evidence starts coming in, I'm thinking it was three days, two and a half, three days for the guilt phase, and then we had a short recess and another five or six days for penalty. I don't know exactly, but that's my guess. I think in three weeks or in a month, we had it done. However, I don't think that things will move that quickly. Why? Why do you think that they won't move that quickly? Your Honor, in the first trial, the guilt phase was essentially uncontested. There was very little cross-examination of the government guilt phase witnesses, including the law enforcement officers who were covering the bodies and whatnot. We anticipate our impression at this time that the guilt phase will be hard fought, that the penalty phase will be hard fought, and that there will be a significantly more robust defense mitigation and presentation of penalties. Any need to sequester the jury this time? I'm just curious. All right, let's hear from Mr. Burke. Thank you. Good morning. May it please the Court, I think I start where Judge Walker started, which is with this presumption of unreliability for co-defendant or accomplice testimony, and that's in the normal case. I disagree with my adversary that there's only an outlier case out there that applies that standard. Well, there are cases that apply the standard, but there are factual distinctions between most of the cases that apply the standard in this case. You know, there were joint trials, the guilt phase, you know, various other distinctions. Are there any cases that you have that... What case do you have that applied the presumption of unreliability in a case that was closest to this on the facts? Well, the newest one, we submitted a Rule 28 letter to the Court just two days ago, and it cites two cases. One is USA v. Vera, B-E-R-A, out of the Ninth Circuit, that reverses in a non-capital sentencing context a district court's reliance on a co-conspirator statement containing a plea agreement, and specifically cites a presumption of unreliability for an accomplice. And it cites an earlier case, which is also cited in our brief, which is U.S. v. Pimentel-Lopez, also a Ninth Circuit case, which is 859, Fed 3rd, 1134. And then in our briefing to the Court, at pages 31 and 32, we cite a whole number of other cases which are held similarly. And I think in this... We submitted with Lee, Lilley, and, you know, obviously, Grutten, and the other cases. And usually, often, they're a joint trial. Here, one of the advantages, I think, the thing that's interesting is the presumption of unreliability comes up in the context of joint proceedings where it's either sentencing or guilt, and the question is, will curative instructions or separate instructions by the Court be sufficient? And in the Kansas case, they were at sentencing. Obviously, they're not for Grutten. You have to excise anything that implicates the non-deferent. And so that's kind of the context in which this comes up. In this case, you've got an even stronger case, it seems to me, in one sense, because there can be no question of instructions here. This evidence is not being used against Lee. He's gone. It's only being used against Fell. So it's, in effect, a directive to use this accomplished testimony against the non-deferent. And that's permitted in the general way under the sentencing rule provided there's reliability. Yes, and I think the question gets back to provided there's reliability. And if you start with the presumption of the common sense notion that you put forward, that there's a presumption against reliability of this kind of statement, and then you add to that the factual showing that was made in this case about this particular person's unreliability, and we're not claiming that in any and all cases co-defendants or accomplished statements are inherently unreliable. We're saying that in this case, given the factual record we made and given this presumption of unreliability, that if you look at it from a due process standard, there is not sufficient guarantees of reliability. And then if you take it one step further and talk about enhanced reliability under the Federal Death Penalty Act or the Eighth Amendment, then it's our argument that that standard was certainly not met. And it's our view, as you alluded to, that the district court did not properly heed that presumption in combination with the evidence that we presented. And the argument that there is, well, everything is covered because there's corroboration, I think comes down to corroboration of what? And what needs to be corroborated, and this is alluded to in Judge Cabranes' opinion in the Scott case, where the court found sentencing errors because there was insufficient corroboration of what was at issue. There's always corroboration of collateral details, but as we read the cases, and especially this Vera case that just came down, and the Scott case out of this circuit, there has to be corroboration of the essence of what it is the co-defendant is saying about the person he's implicating. And I think the clearest way to look at that is when we were here the last time, you characterized the first statement that Lee made, the three-page statement, as outrageous, outrageously false, and I would have to agree with you, but if you look at that statement, he's got very detailed accounting there of what happened. He says, Charlie was in the chair with his throat cut, and Fell's mother was lying on the floor. And we know, indeed, that's where they were found. So there's that kind of corroboration, even as to his ridiculously false statement. Similarly, he talks in that statement about after the Terry King killing, that Fell had taken some money from Terry, and threw her purse in the dumpster at a Burger King. They stopped that after leaving Terry, and we know that the police investigation, in fact, found that purse. So the argument that you can satisfy reliability standards by corroborating  I don't think, holds any water, and this is a good example of why it doesn't. Can you remind me, specifically, what counts will be tried? What counts? Yeah. Well, there's a kidnapping count, there is a carjacking count, and there are two weapon possession counts. And which of those carry the death penalty? The carjacking and the kidnapping. And what's the maximum on the others? The maximum, I believe, on the others are life sentences. Are you... I'm just a little confused. It sounds to me like what you're talking about is the incident with Theresa King, primarily, the carjacking and the kidnapping. Yes. And then the possession of the weapon, too? Or the possession of the weapon is the possession of the knives? The possession of the weapon is the shotgun that was transported across state lines. What about the murders of the two in the house? So the two in the house are only charged in connection with non-statutory aggravating factors. And so all of this evidence we're talking about is being offered in the selection phase solely on the non-statutory aggravator. And as I understood from the first argument, the claim made there was the only statutory aggravator that it was relevant to was the obstruction of justice factor. I think you bring up a legitimate point that it could also be have some bearing on the cruel, heinous and atrocious, but that's the statutory aggravator and it's not being offered on that theory because they're not offering it until the selection phase of the case. So the only way that this is in any way relevant is on the obstruction of justice factor and as you indicated, there is no corroboration for the part of Mr. Lee's statements that implicate Mr. Fell. As far as the motive for doing this? Correct. Well, there is a little bit, right? Because there were warrants out. There were.  who knew what? And did Charlie know about it? Actually, the police officer that they called from Pennsylvania indicated that the warrants did not get issued until the time that Fell and Lee were arrested a month later after they left Vermont. So Lee's third statement said we had warrants outstanding and that statement by Lee is not corroborating because the police officer said no, the warrants didn't get issued until right around the time of their arrest. So it was incorrect? He's incorrect in alleging that there were warrants out. There were not according to the government's own witness. So that aspect of Lee's statement is certainly not corroborated. The fourth statement, he changes up a little bit and he says, oh, it wasn't because warrants were out and he's asked, well, why did Donnie Fell leave Vermont? And his answer is, I have no idea why Donnie Fell left Vermont. I left Vermont because the police were trying to interview me. Not because there were warrants out, because they were trying to interview me. So that portion of his fourth statement is corroborated to a certain extent. But he does not speak in that fourth statement to Mr. Fell's motivation. The only motivational statement he makes is back in his third statement and that is not corroborated. And then the only other thing I wanted to mention was the writing that the court allowed in. We're talking here, again, in the context of a presumption of unreliability. A statement that is not dated. It had been characterized in the first appeal as a letter. But at the hearing, the reliability hearing, Lee's father testified that these writings were not necessarily letters. They were things that either got sent to him by the prison or they got sent to him through other people. So we don't know whether that statement, that written statement that's being admitted is a letter. We don't know what date it was written. And we know the district court summarized that letter, the content of it, in his order. And if you look at the actual content of it, there are two parts of it which are demonstrably false. Because he says in the letter that every time I told them something, they did not want to hear. They said bullshit. Tell me what happened. Forcing me to change my story each time I said something that they did not like. So when the investigating officers were questioned about that at the reliability hearing, each and every one of them said that's completely false. There was never any interchange where we told him that his story was bullshit. And the second part of the statement that's false is he said he was hitting her with a gun, threw me the gun, and told me to hit her. There's no evidence in the autopsy report that there was any forced trauma to either one of these victims. So you have a statement undated, unsigned, no context as to where the statement comes from, when it was written, to whom it was written, which contains false information and it's being offered on the theory that shows that Mr. Fell ordered Mr. Lee to kill his mother. Let me ask you a question about the status of the proceedings. Yes. You heard my hypothetical earlier to Mr. Darrow. Assuming for the argument that you prevail here and the mandate is in the hands of Judge Crawford, you're ready to go forward? We're ready to go forward when the pending motions are adjudicated. Besides the challenge on the table, we have two, I think, very serious constitutional challenges that have been recently filed. One is a challenge to applying the death penalty in a case involving someone who was 20 years old at the time of the offense and there's just been recently some district court development on that issue. We're asking for an evidentiary hearing on that issue. And the second... Why do you need evidence on that? Why do you need evidence? Why do you need evidence for a hearing? Are you trying to show that he had the mind of a minor? We're trying to show that the... Show him that under Roper that there is now a scientific consensus that people in general 20-year-olds have the maturity comparable to an 18-year-old and therefore that the standards of Roper should apply to a 20-year-old. And we have submitted some testimony from experts as a proffer. We're asking the court to actually hear from that. And what's your other major motion? The other major motion that we recently filed is a challenge to the death penalty based on the Supreme Court's recent anti-commentary ruling on the grounds that the Federal Death Penalty Act commands state officials to participate in executions. And so we have... When was that filed? I'm sorry? When was that filed? That would have been filed I believe May 18th. And when was the first motion you adverted to file? That was filed July 2nd. Sorry? July 2nd. So you don't seriously believe... Do you seriously believe that there will be a... The trial proceedings in this case will start in September? Well, I know that's Judge Crawford's desire. I know that... You're not on board with it though, right? I find it difficult to believe that he's going to complete everything we need to complete by that date. He's got to decide the motion for reconsideration after his initial motion. That's true. And that's going to be a long paperwork. I don't think it's an unrealistic date really. No. These motions are a little bit Hail Marys. Yeah, they are Hail Marys and there are a bunch of others that he, as Judge Cabrano said, made disposal from the bench and we'll be ready to go on it. So we're prepared to go. And of course if there's nothing else pending, we will proceed. So you don't see any major obstacle to proceeding other than the disposition of the motions that you have filed? I don't. Of course, if we, he set this July 23rd date that if he has not heard from you, he's going to vacate the trial date. And, you know, the scenario, if we win, then we're done and satisfied. If we lose, we would, of course, file a petition for a hearing and I'm not sure that could be resolved by July 23rd. All right. How about, is Ms. Price, does she wish to be heard? I don't think so unless the court would like to hear from me. That's fine. Thank you very much. Thank you very much. Mr. Daryl? It's been a while since I read it, but can you just briefly summarize for me what Fell said in his confession that was introduced in the first trial? He had an unreported confession. Well, there are five altogether, but the significant ones are the third and the fourth ones. Right. So what do you say in those? Point number one. Okay. They were, he and we are in the Robin Street apartment in the Robin with Debra Fell and Charles Conway. I'm giving you highlights here. That's great. That's exactly what I want. Okay. They  Charlie and Debra Fell with a couple knives from the kitchen. We were drinking beer and there were cards in the kitchen and Debra Fell and Charles were on television, I think, in the other room and they were asking them to turn the music down in the kitchen. Background things like that. But we grabbed a couple knives and I killed Charlie and we killed my mother. And the police, at each interview, questioned, well, why? How did that happen? And the gist of it was, well, I don't know, man. I found myself standing over a dude with a knife and I was stabbing and stabbing him. So what did they say about the kidnapping and the carjacking? What did he say about the kidnapping and the carjacking? He said that after the two of them  out of the car, they grabbed a piece of my shotgun and went out looking for a car. They walked down from Rutland to the, he described the exact route they took, half a mile or whatever it is, block by block, down to this mall where there's a Walmart and a Price Chopper and some other stores. They hid by the side of the Price Chopper waiting for a car. Theresa King drove in and parked fairly close to them. He described her in one of the interviews as the perfect chance because they had approached some other male earlier who pretended to be talking on the cell phone and was doing something with a digital device and backed away from him. But he said Lee then went up to King after she got out of the car and confronted her with a gun. And they drove the car back to the department. Lee is in the front seat with the gun. I may be picking up some details here that Lee had that Bell didn't. They drive back. Lee stays in the car. Bell goes up and gets the luggage and throws it in the trunk and they drive out of Rutland headed south west. They go across the state lines and then they fell with driving. They had taken turns a couple times driving because King had tried to jump out of the car, fell and pulled her back in as he put it. Not sure if that's true. He says he found a nice little spot by the side of the road and pulls over. Bell says and Lee says that they told Mrs. King to get out of the car and go to the woods. She got out of the car but she didn't disappear into the woods if they wanted her to. Bell said that then Lee told him we have to kill her because she knows who we are. We left Rutland. Bell said he agreed. They pursue her up into the woods. This is all Bell's statement. That's what I'm asking you. Yes. Bell said it was Lee's idea. He agreed. They take her up into the woods. The investigation took about 400 feet of road. Bell says he found a little spot. He said he shoved her down. Lee said he punched her. She goes down on the ground and Bell says I used my feet. Lee said he used rocks. They battered her to death. Bell said Lee used one rock. One big rock. Bell said Lee came down on her head with a big rock about yay big. I don't know. It doesn't exclude the possibility of other forensic proof about that. There's a rock about  of my hand. It's actually on part of her clothing. It's got blood stains on it. I think everyone thinks that's probably the rock Lee used to injure her nose. It was a fractured skull. Bell said they then went back to the car. I think he says that he got cash out of her wallet that was in her purse. He's in the passenger seat. Lee's driving there southbound. They stopped. He finds some cash in her wallet. He throws the wallet out the window. There's a couple of egg and sausage things for breakfast. They tried to buy some marijuana from the clerk. They threw away the purse in the dumpster. It's recovered from the dumpster. They disposed of it at the Burger King. They drive to Hillsbury. They were convicted of each of the counts that you outlined to me. The kidnapping and carjacking  On the carjacking and the kidnapping count, if the jury is not satisfied that death was justified in the case, what are the maximum life counts? They are both maximum life counts. I'm pretty sure they are. I haven't thought of what would happen if the jury wanted to convict on kidnapping or carjacking without death  the case. I suppose that would throw it to the district court to impose a just sentence. There would be no discretion to impose life counts. Anything that you urgently wish to bring to our attention based on what you have to say is    have time to answer all the questions right now. I think we have a couple minutes to do that. I haven't thought of what would be a good time to   I think we    minutes to do that. I haven't thought of what would be a good time to do that. I